UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS CHAPPEL,

       Plaintiff,

v.

FARMINGTON HILLS POLICE OFFICERS
GERAK, RADZE, AND BUCKBERRY;
FARMINGTON HILLS POLICE SGT.
CRONIN; AND CITY OF FARMINGTON
HILLS,

       Defendants.

_____/

Case No. 11-12624

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT [11]**

This action, alleging Fourth Amendment violations and municipal liability,[1] is brought

pursuant to 42 U.S.C. § 1983.  It arises from Plaintiff's arrest in the early morning hours of

September 10, 2010, and comes before the Court on Defendants' motion for summary

judgment.  Plaintiff Thomas Chappel's complaint alleges that Defendants, Farmington Hills

Police Officers Gerak, Radze, and Buckberry, and Farmington Hills Sergeant Cronin,

violated his Fourth Amendment rights by arresting him without probable cause and by using

excessive force during that arrest.  Plaintiff also asserts a claim of municipal liability against

Defendant City of Farmington Hills alleging that it ratified or acquiesced in Defendant

Officers unconstitutional conduct when it failed to adequately investigate and discipline

_____

[1]After removal, Plaintiff's state law claims were remanded to state court [6].

Defendant Officers' use of excessive force and had a policy or practice of inadequately investigating claims of excessive force.

Defendants' motion for summary judgment is GRANTED.  Plaintiff's claims against Defendant Officers Gerak and Radze are dismissed because he fails to present any evidence of their involvement in his arrest or the alleged use of excessive force.  Plaintiff's claims against Defendants Buckberry and Cronin are also dismissed because probable cause existed for his arrest and because their use of force was objectively reasonable under the circumstances.  Finally, Plaintiff's claims of municipal liability against Defendant City are dismissed because, absent evidence of a constitutional violation, there can be no municipal liability.

## I.    Facts

On September 7, 2010, the Farmington Hills Police Department received a TIP that an "older red jeep arrives after dark almost every day" at the Woodmont Trailer Park, and the vehicle occupants, "usually a male Black and a female Black," delivers marijuana to Frank Knes,[2] a resident at the Trailer Park, who then sells marijuana and pills to residents in the Trailer Park.  (Defs.' Mot., Ex. 1, 9/7/10 TIP Sheet.)  This drug TIP was assigned to Defendant Sgt. Cronin for investigation.  (*Id.*; Pl.'s Resp., Ex. 3, Cronin Dep. at 8-10.)

After Sgt. Cronin got the TIP sheet, he shared the information with the rest of his unit who did some preliminary checks on the Trailer Park.  Officers started driving around the Trailer Park looking for the red Jeep, watching Frank Knes's trailer, and attempting to

---

[2]Throughout the pleadings and exhibits, two different spellings are provided for Frank Knes ("Knes" and "Kness").  This Court will use "Knes" to refer to this individual.

determine whether drug activity was occurring in the Trailer Park.  (Cronin Dep. at 10-11; Pl.'s Resp., Ex. 2, Buckberry Dep. at 14-16.)

Then, during the night of September 9, 2010, the Farmington Hills Police Department received an anonymous phone TIP that two males, one wearing a black tank top, were at Mulligan's Pub on Eight Mile and Inkster Roads waiting for a red Jeep to arrive with a delivery of cocaine for them.  A clothing description for the other made was also provided. The tipster was in the Bar at the time of the call.  Sgt. Cronin was immediately informed about the TIP and decided that he and his unit would follow up.  (Cronin Dep. at 11-12, 16, 19; Buckberry Dep. at 17-19.)

Sgt. Cronin directed Officer Buckberry to park his unmarked vehicle at a site across the street from Mulligan's Pub on the south side of Eight Mile Road.  This position allowed Officer Buckberry full view of the front of the Bar, its adjacent parking lot, and the only entrance into and out of that parking lot.  Sgt. Cronin's unmarked vehicle was parked to the east of the Bar with a direct view of the front door area of Mulligan's Pub.  He could also see who went into and out of the parking lot, but could not see directly into that lot.  (Cronin Dep. at 12-13, 17-18; Buckberry Dep. at 19-22.)  Two other uniformed officers in a marked police car were parked a little further away in position to stop the red Jeep before it got away.  (Cronin Dep. at 14-15.)

With the clothing description provided by the tipster that evening, Sgt. Cronin and Officer Buckberry were able to identify Frank Knes and another male who turned out to be Plaintiff.  (Cronin Dep. at 19; Buckberry Dep. at 24-25, 62-63.)  For the next few hours, Sgt. Cronin and Officer Buckberry watched Frank Knes and Plaintiff go in and out of Mulligan's Bar about eight to ten times.  They were observed smoking, talking on a cell phone, looking

3

down Eight Mile and Inkster Roads, and walking on the sidewalks around the Bar on Eight Mile and Inkster Roads.  (Cronin Dep. at 18-20, 22, 41; Buckberry Dep. at 24-25.)

While the police were waiting, Sgt. Cronin got two or three additional calls from the front desk of the Farmington Hills Police Department informing him that the tipster had called again and told the police that "these guys" are at Mulligan's and the drug deal is supposed to happen that night.  (Cronin Dep. at 20-21.)  From their conduct, it seemed obvious to Sgt. Cronin that Knes and Plaintiff were waiting for someone.  (Cronin Dep. 22.) Because Plaintiff was observed walking up and down the sidewalk outside the Bar looking down Eight Mile Road, it appeared to Officer Buckberry that Plaintiff was waiting for someone to arrive.  (Buckberry Dep. at 24-26.)  Sgt. Cronin and Officer Buckberry continued their surveillance during the late evening hours of September 9, 2010 and into the early morning hours of September 10, 2010.  (*Id.*)

Just past 1:00 a.m. in the morning, while Plaintiff and Frank Knes were both outside in front of Mulligan's Bar, both Sgt. Cronin and Officer Buckberry saw the red Jeep enter into the Bar's parking lot and stop.  It did not pull into a parking space; it just stopped and sat there.  (Buckberry Dep. at 26-27; Cronin Dep. at 21.)  As the red Jeep pulled into the parking lot, both Sgt. Cronin and Officer Buckberry observed Plaintiff immediately walk away from the other people smoking outside the front door of Mulligan's Bar and over to the parking lot where the Jeep had just entered and stopped.  (Buckberry Dep. at 26-27; Cronin Dep. at 21-22.)  Officer Buckberry observed Plaintiff walk up to the Jeep, hand what the Officer believed was money to the front seat passenger, saw the front seat passenger hand Plaintiff something in return, saw the Jeep pull off, and saw Plaintiff walk away from the Jeep and back towards the Bar.  (Buckberry Dep. at 28, 32.)

4

Officer Buckberry notified the other Officers about the transaction he just witnessed. (Buckberry Dep. at 28.)  Sgt. Cronin got a radio broadcast from Officer Buckberry saying that Plaintiff just went to the passenger window and he and the passenger had just conducted a hand-to-hand drug deal.  (Cronin Dep. at 23.)  The uniformed officers in the marked units were directed to go after the Jeep.[3]  Sgt. Cronin and Officer Buckberry were going to approach Plaintiff, who was on foot in the Bar parking lot. (Buckberry Dep. at 28.)

As soon as Sgt. Cronin heard that Plaintiff had completed a hand-to-hand drug transaction and that the Jeep was leaving the parking lot, he started driving west on Eight Mile Road.  He saw the Jeep leave the parking lot, was confident that the uniformed police would stop the Jeep, and proceeded to pull into Mulligan's parking lot.  (Cronin Dep. at 24-25.)  Sgt. Cronin was the first car to arrive.  He was in an unmarked police car with the emergency lights off.  He pulled into the parking lot fast, slammed on his brakes, and immediately jumped out of his car.  Plaintiff, who was just standing there, looked at Sgt. Cronin, then looked away.  (Cronin Dep. at 26-27.)  As Sgt. Cronin explained:

> And I think because I slammed on my brakes so fast and I was jumping out of the car, he looks at me, looks away, looks at me again with wide eyes and I see his hand go up towards his mouth.  And I screamed out, he just swallowed it.  I said police, stop.  And he's continuing to walk away.

(Cronin Dep. at 26-27.)  When Sgt. Cronin was pulling into the parking lot, Plaintiff was walking east back towards the Bar.  When Sgt. Cronin saw Plaintiff do a "double-take," he believed that Plaintiff recognized that the police had arrived.  Plaintiff then changed directions and started to walk towards the back of the parking lot at a much faster pace to

---

[3]The Jeep was stopped, and its occupants, an African-American female driver and African-American male passenger, were arrested.

get away from the police. (Cronin Dep. at 28-29.)  Sgt. Cronin believed that it was his sudden stop, quickly followed by Officer Buckberry's arrival and turning on his emergency lights that alerted Plaintiff to the fact that the police had arrived.  (Cronin Dep. at 30.)

Officer Buckberry saw Sgt. Cronin pull into the parking lot just ahead of him.  Officer Buckberry stopped his car on Eight Mile Road and activated the red and blue emergency lights on his police car.  Sgt. Cronin's car was just inside the parking lot in front of Officer Buckberry's car.  All this happened very quickly.  (Buckberry Dep. at 29-31, 33.)  Officer Buckberry saw Plaintiff change directions and start walking towards the back of the parking lot.  Quickly, both he and Sgt. Cronin were out of their police cars and were yelling to Plaintiff, "Stop, police."  Both were wearing black vests that say "police" on the chest and on the back in white lettering.  Plaintiff did not stop; he continued to walk away from the Officers.  (Buckberry Dep. at 32, 35; Cronin Dep. at 26, 30.)

At that point, Officer Buckberry observed Plaintiff raise his hand to his mouth, like he was shoving something in his mouth.  Officer Buckberry believed that Plaintiff was eating the drugs he had just received from the red Jeep.  Plaintiff was, at that time, walking away from the police toward the back of the parking lot and had quickened his pace.  Although Plaintiff was not running, Officer Buckberry believed Plaintiff was trying to get away from the police -- "trying to buy himself enough time to swallow the drugs."  (Buckberry Dep. at 29-30, 36-38, 65.)  That's when Sgt. Cronin also saw Plaintiff's hand come up over his mouth and that's when Sgt. Cronin knew Plaintiff had swallowed something.  (Cronin Dep. at 28-29.)

Plaintiff continued to ignore Officer Buckberry's and Sgt. Cronin's orders to stop.  Sgt. Cronin was the first to run and catch up with Plaintiff, grabbed him, and took him to the

6

ground, which is what is typically done to secure a suspect.  (Buckberry Dep. at 38-41.)
Sgt. Cronin described it as a bear hug -- he came up with both arms, wrapped his arms
around Plaintiff's upper torso so as to limit his ability to assault him or use a weapon, and
"pretty much tackled him to the ground."  Plaintiff fell to the ground face-first, and Sgt.
Cronin landed on top of Plaintiff.  (Cronin Dep. at 30, 32-34.)  From Plaintiff's actions, Sgt.
Cronin believed that, once Plaintiff realized they were the police, he was definitely trying
to get away from them.  He wasn't sure if it was to buy time to swallow drugs or if Plaintiff
was thinking of running, but Plaintiff did not stop as they ordered and he was obviously
trying to swallow something.  (Cronin Dep. at 31-32.)

Officer Buckberry then caught up and immediately started handcuffing Plaintiff.
Plaintiff was already on the ground by that time, and Officer Buckberry had his knee on
Plaintiff's thigh, hamstring, or knee area to keep him pinned to the ground.  For safety and
security reasons, because "with most drug investigations, drugs and weapons usually
always go hand in hand," the Officers handcuffed and performed a cursory weapons search
on Plaintiff.  Plaintiff was not being compliant at that point, and Officer Buckberry wanted
to keep Plaintiff's legs pinned to the ground so he couldn't kick or otherwise hurt the
Officers.  (Buckberry Dep. at 38-41; Sgt. Cronin Dep. at 33, 35.)  Sgt. Cronin was telling
Plaintiff to "spit out the drugs."  (Buckberry Dep. at 39; Cronin Dep. at 44-45.)  Plaintiff told
Sgt. Cronin that he already swallowed the drugs.  When asked what he swallowed, Plaintiff
replied that it was a $40 rock of cocaine.  (Cronin Dep. at 44-45.)

Once Plaintiff was handcuffed and a cursory search for weapons was completed,
Plaintiff was immediately put in a sitting position in the parking lot, and Officer Buckberry
and Sgt. Cronin started talking to him.  Plaintiff did not have any weapons or drugs on him,

and he was pretty cordial with the Officers once he was cuffed and brought to a sitting position in the Bar parking lot.  (Buckberry Dep. at 41-43; Cronin Dep. at 35, 45.)

Both Sgt. Cronin and Officer Buckberry noticed a couple of scrapes on Plaintiff's face, probably from where his face hit the parking lot, but nothing significant.  (Buckberry Dep. at 42; Cronin Dep. at 34.)  Plaintiff did not appear to be in distress, did not complain about any injuries, and repeatedly refused medical treatment.  Plaintiff was asked this because both Sgt. Cronin and Officer Buckberry believed Plaintiff had swallowed drugs.  (Buckberry Dep. at 44, 49; Cronin Dep. at  36, 38, 43.)  In fact, both Sgt. Cronin and Officer Buckberry testified that Plaintiff told them he had swallowed a $40 rock of cocaine.  (Buckberry Dep. at 44; Cronin Dep. at 36, 38.)  Sgt. Cronin wasn't concerned about Plaintiff's refusal of medical attention because it was not unusual for drugs to be packaged in a way that allowed them to be swallowed and safely passed though the body in a few days.  (Cronin Dep. at 36.)  Plaintiff did not at any time appear to be in distress and was at all times coherent, talking, and able to carry on a conversation.  (Cronin at 43-44; Buckberry Dep. at 44-49.)

After Plaintiff was put in a sitting position, Sgt. Cronin and Officer Buckberry informed him that he was under arrest.  They also told him why they were at Mulligan's Bar and that they had been watching him for a while.  At that time, Mr. Knes had also been arrested, searched, and brought to the same vicinity as Plaintiff.  The two were questioned separately and could not hear each other.  Plaintiff admitted that he and Frank Knes were there to buy drugs.  (Cronin Dep. at 38-39, 41; Buckberry Dep. at 43-44, 50-51.)  Frank Knes admitted that he and Plaintiff where there for a drug transaction.  The passenger in

8

the red Jeep was arrested and had $40 on his person when he was brought into the police station.  (Cronin Dep. at 41.)

After being arrested, Frank Knes told Officer Buckberry that he knew somebody else who was delivering drugs in Farmington Hills.  (Buckberry Dep. at 52-53.)  Sgt. Cronin asked Plaintiff if he wanted to cooperate with the police, whether he had another drug source that would come into Farmington Hills to deliver to him, and Plaintiff said that he did and he would.  Frank Knes wanted no part of this.  Plaintiff and Frank Knes were then transported to the Farmington Hills Police Station in a marked squad car for processing.  Once there, Plaintiff was to be interviewed by Officer Gerak who would then report back to Sgt. Cronin whether Plaintiff would be a good candidate to cooperate on a drug sting.  Sgt. Cronin did not see Plaintiff or Frank Knes after they were transported from Mulligan's parking lot to the police station.  (Cronin Dep. at 40, 43; Buckberry Dep. at 42-43, 52, 56-57.)

Sgt. Cronin was not involved in the drug deal that was set up for the day after Plaintiff's and Frank Knes's arrest, but Officer Buckberry was.  (Cronin Dep. at 42-43; Buckberry Dep. at 50-51, 53.)  Plaintiff was very cooperative about setting up a drug deal, Frank Knes was not.  (Buckberry Dep. at 54-55.)  Plaintiff and Frank Knes were told that, if they didn't cooperate, the police would forward their arrests to the detectives for prosecution.  They were then released pending further investigation, a common practice for individuals who cooperate.  (Buckberry Dep. at 57.)  The next day, Plaintiff and Frank Knes did call, and a drug deal between them and drug dealers was arranged to occur at a local hotel room.  Once Plaintiff and Frank Knes went to the designated hotel room and knocked on the door, the police arrived and arrested the individuals in the room who had

9

cocaine on them.  (Buckberry Dep at 57-59.)  Officer Buckberry had no further contact with

Plaintiff or Frank Knes after that arranged drug deal.  (Buckberry Dep. at 60.)

Plaintiff's version of the events that occurred on September 10, 2010 is as follows.

Plaintiff, who was 44 years old at the time of the incident, had previously suffered a closed

head injury as a result of a car accident and admitted that his "memory is pretty messed

up" but said he had no trouble remembering something important, "like what the police did

to me."  (Defs.'s Mot., Ex. 1, Arrest Report at 3; Ex. 3, Pl.'s Dep. at 31, 38-40.)

Plaintiff and Frank Knes walked to Mulligan's Bar from Frank's home at the Trailer

Park.  They were at Mulligan's Bar about two hours before the incident in the parking lot.

He and Frank were in and out of the Bar a number of times.  They'd come out to smoke

cigarettes, go back in to shoot some pool, sit at the Bar and hang-out, and go outside again

to smoke cigarettes.  (Pl.'s Dep. at 50-53, 56.)  Because Frank was on the phone a lot and

was acting funny, Plaintiff became suspicious that he might be making a drug deal that

night.  Plaintiff knew that Frank used cocaine, admitted that he used cocaine, and admitted

that he had used cocaine with Frank.  Sometimes Frank would buy, sometimes Plaintiff

would buy.  (Pl.'s Dep. at 57-58.)

Plaintiff denies that he had anything to do with the drug transaction outside of

Mulligan's Bar.  He and Frank were outside Mulligan's smoking a cigarette.  Plaintiff left the

front of Mulligan's to go urinate in the parking lot when the red Jeep pulled into the lot

followed shortly by Sgt. Cronin.

> We were standing out front and Frank was on the phone and -- on his phone, not
> my phone.  I said I'm going to go take a piss.  I says -- because you can't smoke
> in the bar.  I just lit a cigarette up.  I was walking around back to pee in the
> parking lot.  This truck pulled up and said hey, where is Frank, I said what, they
> said come here and I walked over to the truck.  It was two black dudes.  They

> said where is Frank at. I said right over there. I walked out back, I walked back up, I was standing there and they took off. All of a sudden I heard a screeching noise. <u>I turned around</u>, right then police come up and jumped me and beat me up.

(Pl.'s Dep. at 44 (emphasis added).)  Plaintiff explained his encounter with the SUV truck further.

> They say, hey, they said hey to me, they said come here. They said where is Frank at. I said, Frank, <u>I looked at him, right there and Frank and I yelled Frank</u>. That was the last thing I seen him. They took off. The police came in and I got jumped.

(Pl.'s Dep. at 46 (emphasis added).)

After his encounter with the SUV truck, Plaintiff began walking toward the back of the parking lot so he could urinate. He doesn't remember the SUV truck pulling out of the parking lot. He took 10 to 15 steps towards the back of the parking lot when he heard a screeching sound and heard the sound of guys running up behind him. (Pl.'s Dep. at 46-48; Defs.' Reply, Ex. G, Pl.'s Diagram.)  Plaintiff explained what happened next.

> I heard some guys running up. <u>I looked, turned and I got jumped</u>, slammed to the ground. <u>I was trying to get up</u> for a second because I didn't know what was going on. <u>Then I think they said they were police officers. I'm not sure</u>. I can't remember that. I seen a bunch of stars. Then <u>I kept hearing spit it out, spit it out</u>. I was being choked and just kept being slammed into the ground and I was choked. <u>I remember opening my mouth, turned my head</u>. I got nothing in my mouth. <u>Trying to talk</u>. <u>They said quit resisting. I said I'm not resisting</u>. I remember them just kept banging my head with a knee into the ground, smashing my face. Just kept choking me and then I blacked out. I couldn't breath. I kept saying, I can't breathe. I can't breathe. I could barely get it out and that was it. Then I was out. Then I was put in handcuffs, thrown in the car.

(Pl.'s Dep. at 59 (emphasis added).)

Plaintiff could not say how many officers were involved because he did not see anyone and could not give a description. (Pl.'s Dep. at 61, 73.)  He described his take down and a "diving tackle." (Pl.'s Dep. at 61.)  He went down on his face. He thought the

officer who tackled him had his arms confined "because I went straight to my face and stomach, I mean my chest, my chest was scratched up to." (*Id.* at 64.)  The officer was on Plaintiff's back.  (*Id.*)  Plaintiff admitted that, after he landed on his belly, the police stretched out his hands, grabbed his throat and told him to "spit it out, spit it out." (*Id.* at 67.)

When asked if he was knocked unconscious, Plaintiff acknowledged that he "wasn't completely out." (*Id.* at 62).  Rather, he was dizzy and saw stars.  Then, he heard the police tell him to "spit it out, don't resist." (*Id.*)  Plaintiff opened his mouth for them, and stuck out his tongue.  (*Id.*)  When asked if the officer grabbed his throat, Plaintiff replied:

> I can't remember because I was dizzy then.  I was seeing stars.  I don't know if he had his knee on my head.  If he was twisting my arm.  I felt I was coming back from almost blacked out.  I was so dizzy.  I got my bell rung.  I felt someone on my back.  Someone twisting my arm, someone choking me.  I don't know who was all doing it.  I don't know how many guys were on me.

(Pl.'s Dep. at 65.)  Plaintiff felt that someone had his arm, someone had his neck, and someone had a knee on him.  (*Id.*)  He remembered someone with his hand on his throat saying "spit it out." (*Id.*)

When asked to explain what he meant when he said someone kept smashing his head to the ground and that a knee was on his head, Plaintiff said:  "I can't remember.  It was on the back. . . . I can't remember.  It was on the back of my head." (Pl.'s Dep. at 69.) When asked how he knew it was a knee forcing his head down, Plaintiff replied:  "Because I turned my head sideways when he was yelling at me, spit it out.  I could see out of my perspective [sic] vision that there was police on me.  He was a plain clothes guy on me." (*Id.* at 69-70.)  Finally, Plaintiff conceded that he could not "see from behind" his back, but

12

he could feel a "knee, arms, everything" holding him down on his head, his back, and his shoulder." (*Id.* at 70.)

Plaintiff was asked to explain his statement that the police "raised me up and slammed me again, body slammed me." (*Id.* at 71.)  He explained that the police did not pick him up in the air, did not pick his head up in the air.  Rather, "[t]hey were pushing on my head, smashing my face on the ground." (*Id.* at 71-72.)  He demonstrated that his head was to one side, and the police kept pushing on his head, and one officer had his throat and kept saying, "spit it out," and <u>when he tried to talk to the officers and moved his head, they kept pushing his head down</u>.  (*Id.* at 72 (emphasis added).)

Plaintiff admitted that the police did not strike him with their fists or kick him.  (*Id.* at 70.)  The police pulled his arms out from under him, flipped his arms behind his back, and twisted him up, and handcuffed him.  (*Id.* at 72.)

Plaintiff estimated that he was face-down on the ground in the parking lot about three or four minutes.  (Pl.'s Dep. at 69.)  Plaintiff denies that he had a rock of crack cocaine in his mouth, denies that he told the officers that he had swallowed this stuff before, but admits that he told the police that he did not need to go to the hospital.  (Pl.'s Dep. at 67-68.)  Plaintiff admits that he agreed to cooperate with the police in an arranged drug deal because he was told that if he didn't he would be prosecuted for resisting arrest, loitering where drugs were sold, and some charge relating to cocaine.  Frank set up a drug deal the next day.  Although he did nothing to arrange the drug deal, Plaintiff accompanied Frank to the Bahama's Motel on Eight Mile Road where the drug sting occurred.  (Pl.'s Dep. at 73-75.)

Plaintiff complains that he suffered the following injuries as a result of his seizure on September 10, 2010: a broken hand; abrasions on his knee, chest, and face; a split lip, and bruised throat, back, shoulder, and ankle. (Pl.'s Dep. at 78-81.) Three days after this incident, Plaintiff sought medical treatment. The treating physician's report notes that Plaintiff "did not require any acute medical intervention," that "his abrasions had already healed over," and that he had a possible fracture of a bone in the right wrist. (Pl.'s Resp., Ex 4, 9/13/10 report.) There was no evidence of any fractures or serious injury to the head or fractures to the spine, shoulder, knee, foot or chest. (Defs.' Mot., Ex. 5, 9/13/10 reports; Pl.'s Dep. at 25-27.) Plaintiff's medical records show that, on a follow-up visit, Plaintiff was ultimately diagnosed with a possible fracture of the scaphoid – one of eight small bones that make up the carpal bones of the wrist -- in his right wrist. The wrist was casted, and Plaintiff was referred for a CT scan and follow-up with Dr. Chung. (Defs.' Mot., Ex. 5, 10/5/10 report of Dr. D. Brown.)

Plaintiff filed suit on May 27, 2011 in state court. It was subsequently removed here. This matter is now before the Court on Defendants' motion for summary judgment.

## II.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Revised Rule 56 expressly provides that:

14

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

15

## III.  Analysis

Defendants argue that Plaintiff's claims against them must be dismissed because  (1) Plaintiff fails to present any evidence that Defendant Officers Gerak or Radze were involved in his arrest or the alleged use of excessive force; (2) probable cause existed for his arrest; (3) Sgt. Cronin and Officer Buckberry's use of force on him was reasonable; and (4) Plaintiff fails to present any evidence establishing an affirmative link between any policy, practice, or custom of Defendant City and the alleged unlawful arrest and use of excessive force. Defendants also argue, in the alternative, that Defendant Officers are entitled to qualified immunity.  Plaintiff challenges each of these arguments.  The Court begins by analyzing Plaintiff's claims against Defendant Officers Gerak and Radze.

### A.  Claims Against Defendant Officers Gerak and Radze are Dismissed

The Sixth Circuit has observed that "[e]ach defendant's liability must be assessed individually, based on his or her own actions." *Dorsey v. Barber*, 517 F.3d 389, 399 n.4 (6th Cir. 2008) (citing *Ghandi v. Police Dep't of City of Detroit*, 747 F.2d 338, 352 (6th Cir. 1984)).  Moreover, "only officers with direct responsibility for the challenged action may be subject to § 1983 liability."  *Wilson v. Morgan*, 477 F.3d 326, 337 (6th Cir. 2007) (citing *Ghandi*).  Here, there is no evidence that Defendant Officers Gerak or Radze had any direct involvement in Plaintiff's seizure and arrest that give rise to his § 1983 claims.[4] Accordingly, these claims are dismissed with prejudice.

---

[4]At the March 28, 2012 hearing in the matter, Plaintiff's counsel conceded that there is no evidence to support her § 1983 claims against Defendant Officers Gerak and Radze and agreed to dismiss all claims against these Defendant Officers.

The Court now considers Plaintiff's Fourth Amendment claims against Defendants Cronin and Buckberry, beginning with Plaintiff's claims that these Defendants used excessive force when they seized him.

### B.  Claims of Excessive Force are Dismissed

The Court's task is to evaluate Officer Buckberry's and Sgt. Cronin's conduct "under the Fourth Amendment's 'objective reasonableness' standard." *Roberts v. Manigold*, 240 F. App'x 675, 677 (6th Cir. 2007) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004)). Under the Fourth Amendment, a police officer may use only such force as is objectively reasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Determining whether there has been a Fourth Amendment violation requires consideration of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.  "The Court should judge the lawfulness of the conduct from the 'perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight.'" *Morrison v. Bd. of Tr. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (quoting *Graham*, 490 U.S. at 396).  The reasonableness of the use of force is not judged from the subjective perspective of the plaintiff. *Goodrich v. Everett*, 193 F. App'x 551, 555 (6th Cir. 2006) (citing *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004)).

Viewing the facts in the light most favorable to Plaintiff, and applying the above three *Graham* factors, Officer Buckberry's and Sgt. Cronin's physical contact with Plaintiff was objectively reasonable under the circumstances.  First, the drug crime Sgt. Cronin and Officer Buckberry were investigating and hand-to-hand drug delivery they thought they

17

witnessed is serious.  Second, even viewing the evidence in the light most favorable to Plaintiff, it is evident that Defendant Officers believed Plaintiff was actively resisting or impeding an arrest on a drug charge.  Although Plaintiff denies that he swallowed any drugs, he admits that one of the officers was telling him to "spit it out, spit it out."  He admits that, during this time, he was turning his head and trying to talk to the officers.  He admits that, when he was first tackled to the ground, he tried to get up.  He admits that the officers told him to "quit resisting."  (Pl.'s Dep. at 59.)  Although he denies that he knew it was the police that were after him until after he was tackled to the ground, denies that he heard them identify themselves as police until he was on the ground, and denies he heard them yell "stop," he admits that he was first yelling to Frank, who was at the front of the Bar, heard screeching of tires and then turned and started walking toward the back of the parking lot.  Viewed from the perspective of a reasonable officer on the scene, Plaintiff's conduct would give rise to a reasonable conclusion that he was actively resisting, impeding, or attempting to evade his arrest on a drug charge.  Finally, because Defendant Officers were investigating a tip of a drug deal that was about to happen at Mulligan's Bar and thought a drug delivery had occurred, it was reasonable for them to fear for their safety because, in their experience, weapons are commonly involved in drug activity.  Because a reasonable officer in these Defendant Officers' position would have suspected Plaintiff of a serious crime, would have interpreted Plaintiff's actions as an attempt to resist, evade, or impede an arrest, and would have feared for their safety because of the correlation between drugs and weapons, it was reasonable for Sgt. Cronin to tackle Plaintiff to the ground, turn his head while ordering him to "spit" out the drugs both he and Officer Buckberry thought they saw him put in his mouth, and for both Defendant Officers to use

18

force to hold Plaintiff to the ground while they briefly searched him for weapons and then handcuffed him.  There is no evidence here that Defendant Officers used any force on him after he had been  handcuffed and neutralized.  As Plaintiff estimates, all of this took about three or four minutes.  Plaintiff's excessive force claims are dismissed with prejudice.  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  *Graham*, 490 U.S. at 396 (internal citation omitted).

### C. Claims of Unreasonable Seizure are Dismissed

Defendants argue that there was probable cause to arrest Plaintiff for possession of a controlled substance in violation of Mich. Comp. Laws § 333.7403.  Considering the facts in the light most favorable to Plaintiff, this Court agrees with Defendants.

As the Supreme Court observed in *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004), "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."  *Id.*  "A police officer determines the existence of probable cause by examining the facts and circumstances within his knowledge that are sufficient to inform a prudent person, or one of reasonable caution, that the suspect has committed, is committing, or is about to commit an offense." *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (internal quotation marks and citation omitted).  Moreover, "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."  *Devenpeck*, 543 U.S. at 153.  Stated

19

2:11-cv-12624-NGE-RSW   Doc # 20   Filed 04/02/12   Pg 20 of 22   Pg ID 373

otherwise, "his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Id.* Applying these core principles, the *Devenpeck* Court held that "[t]hose are lawfully arrested whom the facts known to the arresting officers give probable cause to arrest." *Id.* at 155.

Here, the arresting officers, Sgt. Cronin and Officer Buckberry, had information that two males were at Mulligan's Bar waiting for a red Jeep to arrive with a delivery of cocaine for them. The tipster gave a description of the two males' clothing, and Plaintiff's clothing matched one of the descriptions. The tipster was also at the Bar at the same time as Frank Knes and Plaintiff, and called the Farmington Hills Police Department front desk a few more times that night, telling them that the two suspects were still at Mulligan's Bar and that the drug deal was supposed to happen that night. During their physical surveillance, Defendants observed Plaintiff and Frank Knes go in and out of the Bar numerous times. While outside, they would smoke cigarettes, talk on their cell phones, and walk along the sidewalk that surrounded the Bar as if looking for a car to arrive. Then, after a few hours, Defendant Officers observed a red Jeep pull into the parking lot next to the Bar. They saw Plaintiff immediately walk to the parking lot. Officer Buckberry saw Plaintiff walk up to the front passenger window and engage in what he believed to be a hand-to-hand drug delivery. He immediately informed Sgt. Cronin what he witnessed, and both sprung into action. Sgt. Cronin drove into the parking lot, saw the red Jeep leave, and Plaintiff turn and begin walking away from him. Sgt. Cronin jumped out of his car and ran towards Plaintiff. Officer Buckberry was close on his heels.

Examining the facts known to Sgt. Cronin and Officer Buckberry at the time of Plaintiff's arrest, this Court concludes that probable cause existed to arrest Plaintiff on a controlled substance violation.  Accordingly, Plaintiff's Fourth Amendment claims alleging an unlawful seizure are dismissed with prejudice.[5]

### D.  Claims Alleging Municipal Liability are Dismissed

Plaintiff's claims against Defendant City are also dismissed.  Because Plaintiff has failed to establish a constitutional violation by any of the Defendant Officers, there can be no municipal liability against Defendant City.  *See Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) (affirming the district court's grant of summary judgment in favor of the municipal defendants and observing that "[i]f no constitutional violation by the individual Defendants is established, the municipal defendants cannot be liable under § 1983.").

## IV.  Conclusion

For the above-stated reasons, Defendants' motion for summary judgment is GRANTED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  April 2, 2012

_____

[5]In light of this Court's determination that there were no Fourth Amendment violations by any Defendants, it is unnecessary to address Defendants' alternative argument asserting that they are entitled to qualified immunity.

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 2, 2012, by electronic and/or ordinary mail.

s/Carol A. Hemeyer

Case Manager